SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Kader S. Mustafa (A-59-24) (090329)**

**Argued October 20, 2025 -- Decided August 3, 2026**

**JUSTICE PIERRE-LOUIS, writing for a unanimous Court.**

In this appeal, the Court considers whether defendant Kader Mustafa was entitled to a diminished capacity jury instruction at trial even though he introduced no expert testimony regarding any mental condition he suffered from.

On May 3, 2018, just before midnight, defendant fatally shot Sciasia Calhoun, who was driving on the same roadway as defendant. Defendant and his then girlfriend, Nicole Fiore, were in a car in front of Calhoun, and defendant was driving. At some point, Calhoun turned her car's high beams on because one of the headlights was out. Defendant allowed Calhoun to pass, then sped up until he almost hit the bumper of her vehicle and started flashing his high beams. As Calhoun began to take an exit off the roadway, defendant pulled out a gun, rolled down his window, and put his car in neutral. Fiore testified that defendant lifted himself out of his seat and fired toward Calhoun.

In July 2018, a grand jury indicted defendant on six counts, including first-degree murder, weapon possession, and endangering charges. Defense counsel advised the State that defendant intended to rely on an insanity defense, but defendant later waived the defense and rejected a plea deal offered by the State; in a pretrial memorandum, defendant or his attorney wrote: "Insanity Defense Withdrawn; No Psychiatric Expert Testimony." Although defendant waived the defense of insanity, the defense of diminished capacity was explicitly raised at trial, and some lay evidence was introduced about defendant's mental health and substance abuse prior to the date of Calhoun's death.

Fiore testified that, in 2017, defendant began seeing her psychiatrist to obtain the prescription drug Adderall because he liked the way it made him feel; that defendant also smoked marijuana in her presence "every day"; that defendant began to research conspiracy theories; that he feared he was a target of "gang stalking" and of people who were shooting laser beams into him; and that, to deflect the rays, defendant wore tin foil on his head. Fiore believed that defendant's claims were similar to the claims made by her uncle, who Fiore testified has schizophrenia.

1

Fiore also testified about defendant's mental health and substance use on the day of Calhoun's death: defendant took Adderall three times within several hours that evening; he began yelling in the car about "people that were trying to hit him with radiation, and trying to . . . mess with him, following him, recording him"; and he screamed that "he couldn't take it anymore," that "this is why his life is so messed up," and that "he had to fight back" after allowing Calhoun's car to pass.

Defendant did not testify, and the defense did not present any witnesses. After the close of evidence, defendant's counsel requested a diminished capacity charge for the jury. Defense counsel submitted that "you do not need a medical diagnosis in order to have evidence of diminished capacity" and argued that expert testimony was unnecessary for the diminished capacity charge. The trial court denied the request, noting that there was no medical or expert testimony. The jury found defendant guilty on all charges. On appeal, the Appellate Division held that the trial court did not abuse its discretion in declining to issue a diminished capacity instruction. The Court granted defendant's petition for certification regarding "whether expert testimony is necessary for a jury to be instructed on diminished capacity." 260 N.J. 469, 469-70 (2025).

**HELD:** Expert testimony is required for defendants to invoke the diminished capacity defense and for the trial court to instruct the jury on that defense.

1. Under N.J.R.E. 702, expert testimony is not appropriate to explain what a jury can understand by itself. In contrast, New Jersey courts have required expert testimony to explain complex matters that would fall beyond the ken of the ordinary juror. When deciding whether expert testimony is necessary, a court properly considers whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment. Absent the aid of expert testimony about esoteric matters, the jury would have to speculate. In contrast to expert testimony, lay testimony may be admitted if it "(a) is rationally based on the witness' perception and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. (pp. 16-18)

2. Under the diminished capacity defense, "[e]vidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense." N.J.S.A. 2C:4-2. Neither N.J.S.A. 2C:4-2 nor any other provision of the Criminal Code defines "mental disease or defect," but the Court has held that all mental deficiencies, including conditions that cause a loss of emotional control, may satisfy the diminished capacity defense if psychological experts believe that kind of mental deficiency can affect cognitive faculties and did affect the defendant's ability to form the requisite mens rea. Before the jury assesses diminished capacity, the court must determine that the evidence of the condition in question is relevant and

2

sufficiently accepted within the psychiatric community to be found reliable for courtroom use, and the record must show that experts in the psychological field believe that the kind of mental deficiency alleged can affect a person's cognitive faculties. Defendants who fail to link their state of mind during the commission of the crime to an underlying mental disease or defect are not entitled to a diminished capacity charge. States are not obligated to recognize the diminished capacity defense, and only about 24 jurisdictions, including New Jersey, do so, with mixed opinions as to whether expert testimony is required. Although the Court has never addressed whether expert testimony is required to assert a diminished capacity defense, the Appellate Division has held that expert testimony is necessary for a plaintiff to contend that mental illness influenced his actions. (pp. 18-25)

3. Without psychological or psychiatric expert testimony, jurors may resort to stereotypes and assumptions about mental illnesses instead of reliable evidence. Additionally, lay people are not equipped with the specialized knowledge needed to distinguish between someone who is actually suffering from mental illness and someone who is pretending to suffer from mental illness to escape culpability for alleged criminal acts. Average jurors also cannot be expected to distinguish between someone suffering from mental illness and someone under the influence of certain narcotics or hallucinogens that cause behavior that might mimic symptoms associated with certain mental diseases or defects. Given the complexity of diagnosing mental health illnesses and, in some cases, the added variable of controlled substance use, jurors should not be left to make assumptions about a defendant's mental status and the impact that such mental status had on the defendant's ability to form the requisite mens rea without testimony from an expert witness. While a jury can consider defendant's behaviors, it cannot conclude that those actions are signs of mental illness without the aid of an expert interpreting them. Expert testimony is also an essential consideration for the trial court when it is determining whether to instruct the jury on diminished capacity. (pp. 25-31)

4. Here, there was no evidence before the jury that identified a mental disease or defect from which defendant suffered. Lay testimony from witnesses like Fiore is certainly admissible to describe observations of defendant's behavior. But only an expert can explain whether defendant was suffering from a mental disease or defect and whether that disease or defect affected defendant's capacity to form the requisite mens rea to commit the charged offense. In order for the jury to be instructed on diminished capacity, expert testimony must be presented. (pp. 31-33)

   **AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE PIERRE-LOUIS's opinion.**

3

# SUPREME COURT OF NEW JERSEY
## A-59 September Term 2024
## 090329

State of New Jersey,

Plaintiff-Respondent,

v.

Kader S. Mustafa,

Defendant-Appellant.

---

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| October 20, 2025 | August 3, 2026 |

---

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Melinda A. Harrigan, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Melinda A. Harrigan, of counsel and on the briefs).

Madhulika Murali a member of the New York bar, admitted pro hac vice, argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Gibbons, attorneys; Lawrence S. Lustberg and Madhulika Murali, on the brief).

Liza Weisberg argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Liza Weisberg, Rebecca Uwakwe, Ezra D. Rosenberg, and Jeanne LoCicero, on the brief).

Thomas R. Clark, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Thomas R. Clark, of counsel and on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

In this case, we consider whether defendant was entitled to a diminished capacity jury instruction at trial.

Defendant Kader Mustafa was tried for the murder of Sciasia Calhoun, whom he shot while driving next to Calhoun's car. Defendant's ex-girlfriend testified that defendant had exhibited erratic behavior for years and that prior to the shooting, he stated that he believed Calhoun and others were following him. At trial, there was no expert testimony regarding any mental condition that defendant suffered from.

The trial court denied defendant's request for a diminished capacity instruction, which requires the jury to determine whether a defendant was, at the time of the offense, suffering from a "mental disease or defect" and whether that mental illness affected that defendant's ability to form the requisite mens rea for the charged offenses. The Appellate Division affirmed,

2

holding that defendant needed to introduce testimony from an expert witness in order to receive the diminished capacity jury instruction.

For the reasons that follow, we affirm the judgment of the Appellate Division and hold that expert testimony is required in order for defendants to invoke the diminished capacity defense and for the trial court to instruct the jury on that defense.

I.

A.

On May 3, 2018, just before midnight, defendant fatally shot Sciasia Calhoun. Calhoun had been driving west on Route 33 near Freehold, New Jersey. Her boyfriend, Herve Michel, and their child were in the car with her. Defendant and his then girlfriend, Nicole Fiore, were in a car in front of Calhoun, and defendant was driving. At some point, Calhoun had turned her car's high beams on because one of the headlights was out. When defendant saw Calhoun's high beams, he became upset, pulled over, and allowed Calhoun to pass. According to Fiore, after defendant allowed Calhoun to pass, he sped up to Calhoun's car until he almost hit the bumper of her vehicle and started flashing his high beams. As Calhoun began to take an exit off the roadway, defendant pulled out a gun, rolled down his window, and put his car in neutral. Fiore testified that defendant lifted himself out of his seat onto the

3

windowsill and used his left hand to fire the gun toward Calhoun. Calhoun's car thereafter veered off to the side of the road.

Michel, who was in the passenger seat, heard Calhoun groan and saw blood start flowing from her head. Michel called the police and described defendant's car as a white Chevrolet Impala. When the police arrived, they found Calhoun suffering from a gunshot wound to the head and observed a bullet hole in the rear driver's side passenger window of Calhoun's car. Medical personnel arrived and began transporting Calhoun to the hospital, but she died en route. A forensic pathology expert concluded that Calhoun's cause of death was a gunshot wound to the head.

After defendant fired his gun, he resumed driving and eventually arrived at his cousin's house in Manalapan Township. He parked in his cousin's yard. Law enforcement's investigation into the shooting led to defendant's brother, who advised police that defendant was at his cousin's house. Defendant's brother also told police that defendant had psychological problems and had recently been at Monmouth Medical Center.[1]

---

[1] On August 25, 2025, the State filed a motion to expand the record to include defendant's hospital records. The State submitted that, although defendant argued that he suffered from delusions and was hospitalized, the hospital records directly negate those assertions. Defendant introduced those records during his sentencing hearing. However, the State asserted that defendant declined to admit the records during trial for "strategic reasons." The State also did not move to admit Mustafa's medical records during trial. Those

The day after the shooting, officers surrounded defendant and Fiore's car and arrested defendant. At the time, defendant was wearing a hard hat with tin foil inside on top of a baseball hat. Defendant was also wearing what an officer described at trial as a "runner's blanket that's used after the races" with "silver material" inside his clothes. Defendant told law enforcement that he was not under the influence of any drugs, prescription medicine, or alcohol.

Inside the trunk of defendant's car, officers found a Smith & Wesson .38 Special revolver containing six live rounds and one spent shell. In a search in and around the car, police also found a loaded semiautomatic handgun, a knife and sheath, brass knuckles, a disassembled cell phone, a flare gun, a box of bullets with one bullet missing, a box of shotgun shells with three shells missing, and discharged cartridges that would have fit into the Smith & Wesson revolver. Gunshot residue was found on top of the driver's side door frame as well as on defendant's clothing. During trial, an expert in firearms and ballistics could not say whether the bullet that struck Calhoun had been discharged from the Smith & Wesson revolver because the bullet was deformed.

---

records were thus not part of the record before the Appellate Division. R. 2:12-6. We deny the State's motion to supplement the record and do not consider those medical records in our decision.

B.

In July 2018, a Monmouth County grand jury indicted defendant on six counts, including first-degree murder, weapon possession, and endangering charges.

In January 2019, defense counsel advised the State that defendant intended to rely on an insanity defense under N.J.S.A. 2C:4-1 and pursuant to Rule 3:12-1. But before trial began, defendant instructed his attorney to waive the insanity defense. Defendant rejected a plea offer from the State and elected to proceed to trial. In a pretrial memorandum confirming his rejection of the State's plea deal, defendant or his attorney wrote: "Insanity Defense Withdrawn; No Psychiatric Expert Testimony." Defendant later confirmed for the trial court that he knowingly made the decision to waive the insanity defense after great consideration. The trial court found that defendant waived the insanity defense "knowingly and voluntarily and with a full knowledge of any potential impact that that decision might have."

Although defendant waived the defense of insanity, the defense of diminished capacity was explicitly raised at trial,[2] and some lay evidence was

---

[2]    The diminished capacity defense is distinct from the insanity defense. The insanity defense allows defendants to establish that, because of "a defect of reason" caused by a "disease of the mind," they are "not criminally responsible" for their conduct. N.J.S.A. 2C:4-1. "Insanity is an affirmative defense which must be proved by a preponderance of the evidence." Ibid. It

6

introduced about defendant's mental health and substance abuse prior to the date of Calhoun's death.

In its opening statement, the State told the jury that they may consider lesser included charges, and that they may also "end up considering some mental health defense of a diminished capacity." During the State's case-in-chief, Fiore testified that in the summer of 2017, defendant began seeing her psychiatrist to obtain the prescription drug Adderall because defendant liked the way Adderall made him feel. According to Fiore, the psychiatrist prescribed defendant four Adderall per day. Fiore testified that defendant also smoked marijuana in her presence "every day."

---

"does not serve to disprove an essential element of the crime, but instead serves to excuse totally the conduct of the actor" even when the State has proven all elements of its claim. State v. Breakiron, 108 N.J. 591, 616 (1987).

"The diminished capacity principles are different." Ibid. Diminished capacity is defined as "a disease or defect of mind that may negate the mental state that is an element of the offense charged." State v. Delibero, 149 N.J. 90, 92 (1997); State v. Rivera, 205 N.J. 472, 487 (2011). "Diminished capacity is a 'failure of proof' defense." State v. Reyes, 140 N.J. 344, 354 (1995) (quoting Paul H. Robinson, Criminal Law Defenses: A Systematic Analysis, 82 Colum. L. Rev. 199, 206 (1982)). In other words, whereas a successful insanity defense can excuse conduct that constitutes a crime, the diminished capacity defense, which we explore in detail later in this opinion, asserts that no crime was committed. It is relevant only for crimes that require a specific mental state. See Breakiron, 108 N.J. at 609-10.

7

Fiore testified that at some point during defendant and Fiore's relationship, defendant began to conduct a lot of internet research on subjects including conspiracy theories. Defendant expressed to Fiore that he thought he was a target of "gang stalking." According to Fiore, defendant thought that "people were out to get him, that people were trying to hurt him, harm him, cause an upheaval in his life, or possibly try to kill him." Fiore testified that defendant also thought that "different cars were . . . out to get him," and that people were shooting laser beams, electromagnetic frequencies, concentrated microwaves, and radiation into him. Defendant told Fiore that he had gone to the hospital and complained that his kidneys were failing due to the rays being shot into him. Fiore testified that, to deflect the rays, defendant wore tin foil on his head under a baseball cap and helmet. Fiore believed that defendant's claims that they were being followed were similar to the claims made by her uncle, who Fiore testified has schizophrenia.

Fiore also testified about defendant's mental health and substance use on the day of Calhoun's death. Fiore stated that defendant took Adderall three times within several hours that evening, including one time when he took two pills at once, prior to encountering Calhoun on Route 33.

While in the car that night, Fiore testified that defendant began yelling about "people that were trying to hit him with radiation, and trying to . . . mess

8

with him, following him, recording him." At one point, Fiore said defendant ripped an earbud out of her ear and started screaming at her to look at the car behind them -- Calhoun's car. According to Fiore, he told her to "look at what they were doing," in reference to the high beams from Calhoun's vehicle.

Fiore testified that after defendant allowed Calhoun's car to pass and then sped up to Calhoun's car, defendant screamed that "he couldn't take it anymore," that "this is why his life is so messed up," and that "he had to fight back." Fiore recalled that defendant almost bumped Calhoun's car with his car and after that, defendant fired his gun at Calhoun's car. When defendant started driving again, Fiore stated that he told her to disassemble her phone or "he [was] going to blow [her] brains out."

During trial, the State played for the jury a July 3, 2018 phone call between defendant and Fiore. On the call, defendant told Fiore that "there's a speculation that my bullet wasn't the bullet that hit that girl. There was a second shot fired." Defendant asked Fiore if she recalled hearing a second shot and Fiore said she did not hear a shot. During her testimony, Fiore again denied hearing or seeing a second shot.

On the phone call, defendant also told Fiore the following:

> [I]t was an accident, though. It was, it was an accident,
> okay? I didn't mean to, but I did it out my window,
> like, to scare them. I didn't know it was going to hit.
> You think I wanted to actually hit something? Like, I

9

did it out my window just to make a noise, you know what I mean? Just so they, because you seen how they were driving. They tried to cut me off when I went right. And then they stayed in front of me.

During the call, defendant also asserted that he was in protective custody "because of gangs." He said, "[t]here were gang members that were following us" and he was "scared for [his] life." Defendant also stated, "[t]he girl that died was a gang member," the "guy next to her was a gang member," and they were "planning to probably shoot me or you." Fiore responded, "[T]his is insane. You better start telling the mother f*cking truth, man."

Defendant did not testify, and the defense did not present any witnesses. After the close of evidence, defendant's counsel requested a diminished capacity charge for the jury. Defense counsel submitted that "you do not need a medical diagnosis in order to have evidence of diminished capacity" and argued that expert testimony was unnecessary for the diminished capacity charge. He stated that while an expert and a diagnosis would be necessary "if there was an insanity defense[,]. . . we're not doing that. But there still is evidence there of a diminished capacity because of his bizarre behavior, all his statements, his psychotic behaviors, delusional complex, his persecution complex, all these things are blatant and obvious in the evidence." Defense counsel later repeated that "[expert testimony] is a requirement for an insanity defense. It's specifically laid out in the statute that it's required. But I

10

respectfully submit it's not required to . . . be added as part of a diminished capacity defense."

The trial court denied the defense's request for a diminished capacity charge. It noted that "most importantly, there was no medical or expert testimony[.] [A]ll of the cases that address when the diminished capacity charge is mandated, all have their genesis in expert testimony, either by the defense or both by the State and the defense." The court also found that the jury might confuse the diminished capacity charge with the insanity defense. Lastly, the court explained that the murder charge itself would provide the jury with a sufficient "basis for evaluating [defendant's] state of mind." In its jury charge, the court explained that the jury could "consider the evidence as to the defendant's use of Adderall in determining whether he was intoxicated to such a degree that he was incapable of acting purposely or knowingly." In summation, defense counsel argued that "whoever" the shooter was, they were not purposely or knowingly trying to kill anyone and stated that Fiore was in a better position to shoot Calhoun from the passenger seat.

The jury found defendant guilty on all charges. The trial court sentenced defendant to an aggregate term of life in prison. Defendant moved for a new trial on the grounds that new evidence had been discovered; that the court

11

erroneously gave the jury a flight charge; and that the court erred in declining to give the jury a diminished capacity charge.

The trial court denied the motion. Regarding diminished capacity, the court reiterated that, in each New Jersey case that discusses when a diminished capacity charge is mandated, there was expert testimony at trial. The court also found that, although the defense presented evidence indicating defendant occasionally exhibited bizarre behavior, there was no evidence that defendant lacked the cognitive ability to form the requisite intent for murder.

On appeal, the Appellate Division held that the trial court did not abuse its discretion in declining to issue a diminished capacity instruction. The court reasoned that, to obtain the instruction, defendant "needed to introduce expert testimony or medical documents sufficiently reliable and accepted within the psychiatric community to assist the jury in determining whether he suffered from a mental disease or defect affecting his cognitive abilities." Evidence of "bizarre" or "quirky" behavior alone was not enough. The Appellate Division found that it was "not self-evident" that a particular mental condition negates the mens rea of an offense because many "mentally disturbed persons" are "capable of acting purposely or knowingly."

In reaching this conclusion, the Appellate Division stated that it was following the reasoning of State v. Arrington, 480 N.J. Super. 428 (App. Div.

12

2024), in which the Appellate Division held that an expert is required for an insanity defense -- a judgment this Court affirms today, see State v. Arrington, ___ N.J. ___, ___ (2026) (slip op. at 36-37).

We granted defendant's petition for certification regarding "whether expert testimony is necessary for a jury to be instructed on diminished capacity." 260 N.J. 469, 469-70 (2025). We also granted leave to appear as friends of the court to the Attorney General, the American Civil Liberties Union of New Jersey (ACLU), and the Association of Criminal Defense Lawyers of New Jersey (ACDL).

## II.

## A.

Defendant argues that no statute, court rule, or case has enumerated a requirement that a defendant must present expert testimony before a jury can consider a diminished capacity defense. He contends that New Jersey courts have always accepted lay testimony in support of this defense. Defendant asks this Court to clarify that if any testimony, including lay testimony, establishes a "rational basis" for a diminished capacity instruction, such an instruction must be provided upon a defendant's request. Defendant argues it was reversible error for the trial court to decline to instruct the jury on diminished capacity.

13

Amicus ACDL argues that defendants have a fundamental right to dispute that they had the requisite mens rea for an offense, including by asserting the diminished capacity defense. The ACDL contends that defendants are entitled to a jury instruction on diminished capacity based on any relevant evidence. The ACLU argues that the statutory underpinnings, history, and purpose of the diminished capacity doctrine demonstrate that expert testimony is not necessary in all cases. Additionally, the ACLU argues that it is unconstitutional to require a defendant to call an expert witness in order to secure a diminished capacity instruction because the New Jersey and the United States Constitutions guarantee criminal defendants a meaningful opportunity to present a complete defense.

B.

The State argues that a defendant claiming diminished capacity must present expert testimony showing an underlying mental disease or disorder that affects the defendant's ability to form the required state of mind. The State asserts that N.J.S.A. 2C:4-2's use of the words "mental disease or defect" suggests a need for competent medical evidence from a trained professional.

The Attorney General argues that expert testimony is required before a jury may be instructed on diminished capacity. The Attorney General contends that defendant bears the burden of producing evidence that his

14

condition exists and submits that only experts can provide a diagnosis and opine as to how a mental disease affected defendant's formation of the necessary mental state. The Attorney General asserts that an expert testimony requirement neither implicates fundamental fairness concerns nor violates the constitutional right to a complete defense.

III.

A.

The "standards of review of jury instructions are well-settled: if the party contesting the instruction fails to object to it at trial, the standard on appeal is one of plain error; if the party objects, the review is for harmless error." State v. Cooper, 256 N.J. 593, 607 (2024) (quoting Willner v. Vertical Reality, Inc., 235 N.J. 65, 80 (2018)). Here, defendant requested that the trial court give a diminished capacity charge, and the trial court "noted" counsel's objections to its determination not to give the charge. Accordingly, we first consider whether it was error to deny the requested instruction and, if so, we would then consider whether the error was harmless. See id. at 607-08.

Here, our determination whether it was error to deny the requested jury instruction depends on whether a defendant's assertion of the diminished capacity defense requires expert testimony.

B.

The New Jersey Rules of Evidence permit "a witness qualified as an expert" to "testify in the form of an opinion or otherwise" "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.J.R.E. 702. Under Rule 702, "expert testimony is not appropriate to explain what a jury can understand by itself." State v. J.L.G., 234 N.J. 265, 305 (2018). In contrast, "New Jersey courts have required expert testimony to explain complex matters that would fall beyond the ken of the ordinary juror." State v. Fortin, 189 N.J. 579, 596-97 (2007) (emphasis added) (holding that expert testimony is necessary to explain the unique aspects of two sexual assaults that suggest the crimes "are the handiwork of the same person"); see also State v. Hannah, 263 N.J. 411, 447 (2026) (holding that an expert witness is required to present testimony when a party seeks to introduce evidence regarding the cell towers to which certain cell phones connected); Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 407-08 (2014) (holding that expert testimony is necessary to explain New Jersey's "complex regulatory scheme" for fire prevention); Sanzari v. Rosenfeld, 34 N.J. 128, 134-35 (1961) (holding that expert testimony is necessary to establish the standard of care in "the ordinary dental or medical malpractice case" because the jury lacks the "technical training

16

necessary" to determine the standard itself). When "deciding whether expert testimony is necessary, a court properly considers 'whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment.'" Davis, 219 N.J. at 407-08 (quoting Butler v. Acme Mkts., Inc., 89 N.J. 270, 283 (1982)).

Most recently in Hannah, a case involving the highly technical subject area of cell site location information (CSLI), we stated that "leaving the jury to draw . . . inferences" from CSLI "without a full explanation of its technical aspects and capabilities by an expert witness" risked "confusing and misleading" the jury. 263 N.J. at 445. We held that expert testimony gave the jury the "tools necessary to understand" and "interpret" relevant evidence. Ibid.

Absent the "aid of expert testimony" about esoteric matters, "the jury 'would have to speculate.'" Davis, 219 N.J. at 407 (quoting Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001)). "[T]he average juror is relatively helpless in dealing with a subject that is not a matter of common knowledge." Fortin, 189 N.J. at 596 (quoting State v. Kelly, 97 N.J. 178, 209 (1984)).

In contrast to expert testimony, lay testimony may be admitted if it "(a) is rationally based on the witness' perception and (b) will assist in

17

understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. Lay opinion testimony must be about a matter of "common knowledge." State v. Bealor, 187 N.J. 574, 586 (2006) (quoting State v. Johnson, 120 N.J. 263, 294 (1990)).

In State v. Risden, where the defendant advanced an insanity defense, we affirmed the Appellate Division's decision to remand the case for a new trial in part because the trial court erroneously precluded lay witnesses from testifying about the defendant's "wild, mad," and "crazy" appearance. 56 N.J. 27, 40-41 (1970). We held that such testimony "requires no expertise. It springs from the common understanding and experience of mankind. It represents the reaction of an ordinary man arising from his observation and is helpful to an understanding of his testimony and an appreciation of the mental or emotional state of the person described." Id. at 40. The defendant in Risden, however, called a psychiatric expert to testify in support of her insanity defense in addition to the lay witness. Id. at 33-34. And the State called a psychiatrist to testify in opposition to the defense. Id. at 36-37.

## C.

This Court has not previously considered whether expert testimony is required to assert a diminished capacity defense.

That defense is codified in the New Jersey Code of Criminal Justice:

> Evidence that the defendant suffered from a <u>mental disease or defect</u> is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.
>
> [N.J.S.A. 2C:4-2 (emphasis added).]

"A jury considers evidence of diminished capacity in relation to the State's burden to prove the essential elements of the crime." <u>Delibero</u>, 149 N.J. at 98. Asserting a diminished capacity defense under N.J.S.A. 2C:4-2 does not shift the burden of proof to the defendant. <u>Galloway</u>, 133 N.J. at 648-49. "If the defendant's evidence on mental disease or defect is sufficient to raise a reasonable doubt about the existence of the requisite intent," <u>Humanik v. Beyer</u>, 871 F.2d 432, 443 (3d Cir. 1989), the State must shoulder "the burden of proving beyond a reasonable doubt that defendant <u>was</u> capable of forming the necessary intent at the time of the [crime], despite the presence of mental disease or defect," <u>State v. Rivera</u>, 205 N.J. 472, 488 (2011) (alteration in original) (quoting <u>State v. Reyes</u>, 140 N.J. 344, 359 (1995)).

Neither N.J.S.A. 2C:4-2 nor any other provision of the Criminal Code defines "mental disease or defect."[3] <u>See</u> N.J.S.A. 2C:4-2; <u>State v. Breakiron</u>,

---

[3] Disability organizations and scholars advise against using the word "defect" when describing a mental disability because of the term's offensive nature. <u>See</u> Nat'l Ctr. on Disability in Journalism, <u>Disability Language Style Guide</u>,

19

108 N.J. 591, 618 n.10 (1987) ("Some states have attempted to define the relevant mental diseases or defects. Our Code does not." (citation omitted)).[4] "[I]n eschewing technical definitions of mental disease or defect, [the Criminal Code's drafters] intended to leave that determination to the finders of fact." State v. Galloway, 133 N.J. 631, 642 (1993).

Our case law does, however, offer some insight into the phrase's meaning, including what it does not mean. In Galloway, this Court held that "mental disease or defect" is a broad category that is not limited to clinically defined conditions:

> [T]he Legislature by its use of the term "mental disease or defect" did not intend to preclude evidence of a mental condition consisting of a "disorder" as such. Forms of psychopathology other than clinically[] defined mental diseases or defects may affect the mental process and diminish cognitive capacity, and

---

https://ncdj.org/style-guide/#birthdefect (last visited July 29, 2026) (describing the word "defect" as "offensive"); see also ADA Nat'l Network, Guidelines for Writing About People With Disabilities, https://adata.org/factsheet/ADANN-writing (last visited July 29, 2026) (recommending against the word "defective" when referring to people with disabilities as it "suggests a lack of something"); Kathryn A. LaFortune, Eliminating Offensive Legal Language, 49 Am. Psych. Assoc., Jud. Notebook 5, 29 (2018) (referring to "mentally defective" as a "derogatory term[]"). We recognize the offensiveness of the phrase "mental defect" and use it in this opinion only as is necessary in our interpretation of N.J.S.A. 2C:4-2, which contains that phrase.

[4] An explanatory note in the Model Penal Code (MPC) states that the MPC section on the insanity defense also does "not define mental disease or mental defect, those terms being left open to accommodate developing medical understanding." Model Penal Code § 4.01 explanatory note.

20

therefore may be regarded as a mental disease or defect in the statutory or legal sense.

[Id. at 643.]

In Galloway, we also acknowledged "that psychiatric classifications may not precisely fit our legal concepts of criminal responsibility." Id. at 644 (citing Breakiron, 108 N.J. at 618 n.10). "[A]ll mental deficiencies, including conditions that cause a loss of emotional control, may satisfy the diminished-capacity defense" if psychological experts believe that kind of mental deficiency can affect cognitive faculties and did affect the defendant's ability to form the requisite mens rea. Id. at 647 (emphasis added). Breakiron identified examples of "[t]he variety and forms of mental disease," including paranoia, schizophrenia, affective disorders, psychopathy, depression, and anti-social disorders. 108 N.J. at 618 n.10.

A defendant must satisfy a two-pronged test to be entitled to the diminished capacity jury instruction. "[T]he trial court is required to give a diminished capacity charge to the jury" when "(1) [the defendant] 'has presented evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or mens rea[,]' and (2) 'the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental

21

state necessary for the commission of the crime.'" Baum, 224 N.J. at 160-61 (emphasis omitted) (quoting Galloway, 133 N.J. at 647).

We have also held that, before the jury assesses diminished capacity, the court must "determine[] that the evidence of the condition in question is relevant and sufficiently accepted within the psychiatric community to be found reliable for courtroom use." Id. at 161 (quoting Galloway, 133 N.J. at 643). The record must show that "experts in the psychological field believe that [the] kind of mental deficiency [that defendant alleges] can affect a person's cognitive faculties." Galloway, 133 N.J. at 647. Defendants who fail to "link[]" their state of mind during the commission of the crime "to an underlying mental disease or defect" are not entitled to a diminished capacity charge. Reyes, 140 N.J. at 361.

States are not obligated to recognize the diminished capacity defense. In Clark v. Arizona, the United States Supreme Court held that Arizona could constitutionally prohibit "mental-disease and capacity evidence" offered in an attempt to show diminished capacity. 548 U.S. 735, 770-71 (2006). The Court stated that in Arizona, "mental-disease and capacity evidence may be considered only for its bearing on the insanity defense . . . . The mental-disease and capacity evidence is thus being channeled or restricted to one issue . . . . [T]he question is whether reasons for requiring it to be channeled and

22

restricted are good enough to satisfy the standard of fundamental fairness that due process requires. We think they are." Ibid (emphasis added).

Only about 24 jurisdictions, including New Jersey, currently recognize the diminished capacity defense in some form. See Alaska Stat. Ann. § 12.47.020; Ark. Code Ann. § 5-2-303; State v. Hines, 445 A.2d 314, 317 (Conn. 1982); Veverka v. Cash, 318 N.W.2d 447, 449 (Iowa 1982); Me. Stat. tit. 17-A, § 38; Mo. Rev. Stat. § 552.015.2(8); Mont. Code Ann. § 46-14-102; State v. Hood, 917 N.W.2d 880, 889 (Neb. 2018); N.J.S.A. 2C:4-2; State v. Balderama, 88 P.3d 845, 855 (N.M. 2004); People v. Segal, 429 N.E.2d 107, 110 (N.Y. 1981); State v. Page, 488 S.E.2d 225, 231 (N.C. 1997); N.D. Cent. Code Ann. § 12.1-04.1-01; Or. Rev. Stat. § 161.300; Commonwealth v. Hutchinson, 25 A.3d 277, 312 (Pa. 2011); Washington v. State, 989 A.2d 94, 101 (R.I. 2010); State v. Schouten, 707 N.W.2d 820, 825 (S.D. 2005); State v. Adams, 405 S.W.3d 641, 661 (Tenn. 2013); Davis v. State, 313 S.W.3d 317, 328 (Tex. Crim. App. 2010); Utah Code Ann. § 76-2-305(2) to (3); State v. Congress, 114 A.3d 1128, 1137-40 (Vt. 2014); State v. Clark, 389 P.3d 462, 467 (Wash. 2017); State v. Joseph, 590 S.E.2d 718, 725 (W. Va. 2003); State v. Flattum, 361 N.W.2d 705, 716 (Wis. 1985).[5]

---

[5] Several states occupy a gray area. For example, Kansas's Supreme Court said that the state is "among a minority of states that have done away with the insanity and diminished capacity defenses." State v. Jorrick, 4 P.3d 610, 617

23

To our knowledge, only six of those 24 states, by a ruling from the highest state court or by statute, have clarified whether expert testimony is necessary, with mixed opinions on the matter.  See Alaska Stat. §§ 12.47.020(a) and .070(a) (requiring the court to appoint "a qualified psychiatrist or psychologist to examine and report on the mental condition of" a defendant asserting the diminished capacity defense); Commonwealth v. McCullum, 738 A.2d 1007, 1009 (Pa. 1999) ("Diminished capacity is an extremely limited defense that requires psychiatric testimony . . . ."); Clark, 389 P.3d at 467 ("[D]iminished capacity requires an expert diagnosis of a mental disorder and expert opinion testimony . . . ."); Joseph, 590 S.E.2d at 725 ("[T]he diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect . . . ."); State v. MacFarland, 275 A.3d 110, 116 (Vt. 2021), as amended Nov. 30, 2021 ("[E]xpert testimony is [not] necessary to show diminished capacity . . . ."  (second alteration in original) (quoting State v. Duford, 660

_____

(Kan. 2000).  But Kansas has a statute under which "[i]t shall be a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the culpable mental state required as an element of the crime charged.  Mental disease or defect is not otherwise a defense."  Kan. Stat. Ann. § 21-5209.  Likewise, the Supreme Judicial Court of Massachusetts held that "[w]hile there is no diminished capacity defense in Massachusetts, . . . the defense may produce psychiatric evidence that would allow a jury to consider whether the defendant lacked the mental capacity to premeditate the killing." Commonwealth. v. Gaboriault, 785 N.E.2d 691, 699 (Mass. 2003).

24

A.2d 736, 737 (Vt. 1995))); Flattum, 361 N.W.2d at 716 ("[W]e find . . . that either psychiatric testimony or lay testimony detailing the psychiatric and personal history of the defendant may be admitted, if relevant, to cast doubt upon . . . the defendant's intent to commit the crime charged.").

Although this Court has never addressed whether expert testimony is required to assert a diminished capacity defense, the Appellate Division has held that expert testimony is necessary for a plaintiff to contend that mental illness influenced his actions. Mullarney v. Bd. of Rev., 343 N.J. Super. 401, 408 (App. Div. 2001) ("That contention is so esoteric that a fact-finder of common judgment and experience cannot form a valid judgment on the contention without the assistance of expert testimony."). And commentators on our Rules of Evidence have stated that "any claim of mental illness affecting behavior is probably sufficiently esoteric to require expert testimony." Biunno, Weissbard, & Zegas, Current N.J. Rules of Evid., cmt. 2.3 on N.J.R.E. 702 (2026).

IV.

Applying those principles, we now hold that expert testimony is required in order for defendants to invoke the diminished capacity defense and have the jury instructed on that defense.

25

The plain language of N.J.S.A. 2C:4-2 dictates that "[e]vidence that the defendant suffered from a <u>mental disease or defect is admissible whenever it is relevant to</u> prove that the defendant did not have a state of mind which is an element of the offense." (emphasis added). Understanding what is or is not a mental "disease or defect" -- and further determining whether that ailment altered defendant's state of mind at the time of the offense -- requires specialized knowledge beyond the ken of average jurors. Accordingly, under our Rule 702 jurisprudence, expert testimony must be presented to the jury to assist with the diminished capacity determination. Jurors should not be left to speculate in the highly specialized area of mental illness in the high stakes setting of a criminal trial.

N.J.S.A. 2C:4-2 is silent as to the type and caliber of evidence required before the trial court charges a jury with instructions regarding diminished capacity. However, the statute's plain language explains that in order for evidence of diminished capacity to be admitted, the evidence must establish the following facts that undoubtedly require specialized knowledge in the field of mental health: that defendant (1) "suffered from a mental disease or defect," and (2) as a result of that mental disease or defect, "defendant did not have a state of mind which is an element of the offense."

The assessments required by N.J.S.A. 2C:4-2 ask jurors to reach beyond their common knowledge and understanding. The determination of whether someone is suffering from a mental condition requires specialized knowledge in mental health fields. Indeed, this Court's jurisprudence has held that a diminished capacity instruction is warranted when the record shows that "experts in the psychological field believe that [the] kind of mental deficiency [at issue] can affect a person's cognitive faculties." Galloway, 133 N.J. at 647. Lay people, including average jurors, are not skilled in diagnosing mental diseases. Without psychological or psychiatric expert testimony, jurors may resort to relying on stereotypes and assumptions about mental illnesses instead of reliable evidence.

Additionally, lay people are not equipped with the specialized knowledge needed to distinguish between someone who is actually suffering from mental illness and someone who is pretending to suffer from mental illness to escape culpability for alleged criminal acts. Even mental health professionals have identified the difficulties they face in deciphering whether individuals are truly suffering from mental illness or are malingering -- feigning of a psychological or physical ailment for gain. See Jeffrey J. Walczyk et al., A Review of Approaches to Detecting Malingering in Forensic Contexts and Promising Cognitive Load-Inducing Lie Detection Techniques, 9

27

Frontiers in Psychiatry 1, 2 (2018) ("[D]espite ongoing advances in malingering detection, . . . many individuals successfully malinger mental [and] cognitive disorders in order to . . . avoid prison."); Barry Rosenfeld et al., Litigator's Handbook of Forensic Medicine, Psychiatry, and Psychology § 15:1 (2024) (noting that "observable signs of mental illness can often be identified, such as slowed speech, hyperventilating, and bizarre clothing or movements, but these too can be easily feigned, provided the individual gives a convincing presentation").

Average jurors also cannot be expected to understand and distinguish between someone suffering from mental illness and someone under the influence of certain narcotics or hallucinogens that cause behavior that might mimic symptoms associated with certain mental diseases or defects. Here, defendant's ex-girlfriend, Fiore, noted that defendant took multiple doses of Adderall prior to the shooting.[6] Given the complexity of diagnosing mental

---

[6] As an amphetamine, the side effects of Adderall use and/or misuse include exacerbation of pre-existing psychosis as well as new psychotic or manic symptoms, including hallucinations, delusional thinking, or mania in patients with no prior history of psychotic illness. Food & Drug Admin., Full Prescribing Information: Adderall XR 5.4 https://www.accessdata.fda.gov/ drugsatfda_docs/label/2026/021303s040,021977s052,208510s009,022063s007 lbl.pdf; Mass Gen. Brigham Commc'ns, High Doses of Adderall May Increase Psychosis Risk, Harv. Gazette, https://news.harvard.edu/gazette/story/2024/09/ high-doses-of-adderall-may-increase-psychosis-risk/ (last visited July 29, 2026) (describing research findings that patients taking a high dose of prescription amphetamines face more than a five-fold increased risk of

health illnesses and, in some cases, the added variable of controlled substance use,[7] jurors should not be left to make assumptions about a defendant's mental status and the impact that such mental status had on the defendant's ability to form the requisite mens rea without testimony from an expert witness to assist the jury in understanding any diminished capacity evidence before them. See Biunno, Weissbard & Zegas, cmt. 2.3 on N.J.R.E. 702 ("[A] jury should not be allowed to speculate without the aid of expert testimony in any area where laypersons could not be expected to have sufficient knowledge or experience.").

During oral arguments, defense counsel asserted that, in the context of defendant's strange behaviors and beliefs, a "reasonable person could certainly conclude that that person might be suffering from a mental disease or defect." We disagree. While a jury can consider defendant's behaviors, it cannot conclude that those actions are signs of mental illness without the aid of an expert interpreting them. See Hannah, 263 N.J. at 445 (holding that expert testimony was required for the jury to possess the "tools necessary to understand" and "interpret" relevant evidence).

---

psychosis or mania, and findings that this risk was highest in those taking a dose corresponding to 40 mg of Adderall or more).

[7] Pursuant to N.J.S.A. 2C:2-8, except in certain circumstances, "intoxication of the actor is not a defense unless it negatives an element of the offense."

29

Expert testimony is also an essential consideration for the trial court when it is determining whether to instruct the jury on diminished capacity. As noted, this Court has held that a trial court must give a diminished capacity charge to the jury when

> (1) [the defendant] "has presented evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or mens rea[,]" and (2) "the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental state necessary for the commission of the crime."
>
> [Baum, 224 N.J. at 160-61 (second alteration in original) (emphasis omitted) (quoting Galloway, 133 N.J. at 647).][8]

Additionally, before charging the jury with diminished capacity, the trial court must "determine[] that the evidence of the condition in question is <u>relevant and sufficiently accepted within the psychiatric community</u> to be found reliable for courtroom use." Id. at 161 (emphasis added) (quoting Galloway, 133 N.J. at

---

[8] In accordance with these requirements that the record contain evidence, the model jury instruction for diminished capacity suggests that judges should begin by noting that "[e]vidence alleging that the defendant suffered from a mental disease or defect . . . has been produced." Model Jury Charges (Criminal), "Evidence of Mental Disease or Defect (N.J.S.A. 2C:4-2)" (rev. June 5, 2006). The instruction then asks the jurors to consider whether they "have a reasonable doubt whether the defendant's mental functioning was such as to render him/her incapable of acting with the required state of mind, or if [they] have a reasonable doubt whether he/she did in fact act with the required state of mind." Ibid.

30

643). A trial court, therefore, is required in the first instance to make determinations about whether a reasonable jury could find that a defendant suffers from a mental disease or defect that impaired their ability to act culpably. The trial court must further discern, all based on the evidence presented at trial, whether the evidence in question of the alleged mental condition is "relevant and sufficiently accepted within the psychiatric community to be found reliable for courtroom use." Ibid. Those determinations require expert evidence.

Here, there was no evidence before the jury that identified a mental disease or defect from which defendant suffered. Aside from Fiore's theory that she believed defendant's behavior was similar to the behavior of her uncle who has schizophrenia, the jury heard no testimony and saw no medical records or other documentary evidence showing defendant suffered from a mental disease or defect. Even if defendant did suffer from a mental disease or defect, no such evidence was presented to the jury and, as this Court stated in Breakiron, "[n]ot every mental disease or defect has relevance to the mental states prescribed by the [Criminal] Code." 108 N.J. at 618 n.10. Having a mental disease or defect is only half the analysis under N.J.S.A. 2C:4-2 regarding admissibility of evidence of mental illness. Defendants must also "link[]" their state of mind during the commission of the crime "to an

31

underlying mental disease or defect." <u>Reyes</u>, 140 N.J. at 361. Defendants who do not present such evidence at trial are not entitled to a diminished capacity charge. <u>Ibid.</u>

As the United States Supreme Court noted in <u>Clark</u>, states can constitutionally prohibit a diminished capacity defense altogether and in doing so may exclude or limit evidence helpful to the defense if the exclusion serves interests like fairness and avoiding misleading the jury. 548 U.S. at 770-71. Introducing the diminished capacity charge to a jury without expert testimony on mental diseases and defects, and the ability of those ailments to impact the required mens rea for the offense, would risk confusing the jury.[9]

---

[9] For this reason, we reject the ACLU's argument that it would be unconstitutional to require a defendant to call an expert witness to secure a diminished capacity instruction because it would deprive defendants of their meaningful opportunity to present a complete defense. Both the United States Constitution and New Jersey Constitution guarantee the "meaningful opportunity to present a complete defense." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984); <u>Clark</u>, 548 U.S. at 769); <u>accord</u> <u>State v. Chambers</u>, 252 N.J. 561, 582 (2023). However, "the right to introduce relevant evidence can be curtailed if there is a good reason for doing that." <u>Clark</u>, 548 U.S. at 770. Trial judges can exclude evidence "if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." <u>Ibid.</u> (quoting <u>Holmes v. South Carolina</u>, 547 U.S. 319, 326 (2006)); <u>State v. Budis</u>, 125 N.J. 519, 531 (1991) (stating that the "right to confront and cross-examine accusing witnesses" -- which guarantees the right "to present a complete defense" -- "is not absolute, and may, in appropriate circumstances, bow to competing interests").

In this case, defendant exhibited behaviors many might deem unusual, including wearing tin foil on his head and expressing fears that people are out to get him and shooting laser beams at him. Lay testimony from witnesses like Fiore is certainly admissible to describe observations of defendant's behavior. As we held in <u>Risden</u>, such testimony "requires no expertise" as it comes from "the common understanding and experience of mankind" and "is helpful to an understanding of [the witness's] testimony and an appreciation of the mental or emotional state of the person described." 56 N.J. at 40. But only an expert can explain whether defendant was suffering from a mental disease or defect and whether that disease or defect affected defendant's capacity to form the requisite mens rea to commit the charged offense. In order for the jury to be instructed on diminished capacity, expert testimony must be presented.

## V.

The Appellate Division's judgment is affirmed.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE PIERRE-LOUIS's opinion.